CLEONA M. BUNDY ET AL. *v.* STATE OF VERMONT HIGHWAY DEPARTMENT ET AL.

February Term, 1929.

Present: WATSON, C. J., POWERS, SLACK, MOULTON, and WILLCOX, JJ.

Opinion filed May 8, 1929.

*Theriault & Hunt* for defendants.

*Porter, Witters & Longmoore* for the petitioners.

SLACK, J.   This is an appeal from an order of the commissioner of industries awarding compensation to the dependents of Clyde Bundy who was drowned in the great flood of November, 1927.

The material facts upon which the order was predicated are these:   For some time prior to his death Bundy was employed by the Vermont Highway Department as engineer on a

steam shovel which was used in highway construction work and was located about one-half mile south of Bolton toward Waterbury. He boarded and roomed at Waterbury which was conceded in argument to be a place of his own selection. It was "so rainy" November 3 that only a few men, out of about two hundred who were employed on the same job that Bundy was, worked. Those men were engaged in an attempt to keep the main road from Waterbury to Richmond, via Bolton, in passable condition. Bundy reported for work that morning and asked to be permited to return to Waterbury, but was told that his services were needed at the shovel to provide gravel for emergency work on the highway. As a result of that talk he remained at the shovel until about five-thirty o'clock in the afternoon. After that time he was "a free agent to go where he saw fit." He tried to get to Waterbury, but failing to do so on account of the high water he went to the Hayes boarding house, so-called, which was located 75 or 80 rods from the steam shovel and put up for the night. This house was a private institution with which the State was in no way connected. Sometime during the night (the claimants say in their brief about ten-thirty o'clock) this house was carried away by the flood and all of its occupants (several in number), except one, were drowned.

It is fairly inferable from the findings, though not expressly so stated, that this house was swept away by the "sudden rush of water" that followed the collapse of the railroad embankment which was west of and in close proximity to said house.

At the time Bundy attempted to get to Waterbury the highway was passable for four or five miles in each direction from the Hayes boarding house and the commissioner says that possibly he could have escaped to the hills or taken refuge in some building which was not carried away. That this was so is apparent from the fact that a witness, who testified before the commissioner that he saw Bundy enter the boarding house, sought shelter elsewhere and escaped.

It is further found that Bundy's work kept him in that neighborhood until it was impossible for him to reach Waterbury or any public house except the one where he went; that in going to that house he did the natural and reasonable thing and was in no way negligent in so doing; that the average rea-

sonable man could not then have foreseen that a flood of unprecedented proportion was impending.

It is also found that faithful work under trying conditions and performance of duty in an emergency exposed Bundy to an unusual and unexpected hazard from the elements, and made it impossible for him to seek safety by the accustomed routes and means of travel; that his work was the cause of his remaining in this extremely hazardous neighborhood, so that he was subjected to greater danger from the elements than other men employed in the construction work; and that his work placed and kept him there until escape by the usual means of travel was impossible.

Upon these findings the commissioner held that Bundy's death was due to an accident arising out of and in the course of his employment, and awarded compensation accordingly.

This holding is challenged on the ground that it is not supported by the findings; that the death of Bundy was caused solely by an act of God wthout the contribution of any human agency incident to the employment, and that on the whole record the claim is not compensable under the law.

The ultimate purpose of the Workmen's Compensation Act is to treat the cost of personal injuries incidental to the employment as a part of the cost of the business. It does not afford compensation for injuries or misfortunes which are merely contemporaneous or coincident with the employment, or collateral to it. The essential connecting link of direct causal connection between the injury and the employment must be established before the act becomes operative. The injury must be the result of the employment, and flow from it as the inducing proximate cause. The rational mind must be able to trace the resultant injury to a proximate cause set in motion by the employment, and not by any other agency, or there can be no recovery. Madden's Case, 222 Mass. 494, 111 N. E. 379, L. R. A. 1916D, 1000. Two things are necessary to make a claim compensable under the act; the injury must "arise out of" the employment, and it must be received "in the course of" the employment. Neither alone is enough. *McNicol's Case,* 215 Mass. 497, 102 N. E. 697; *Larke* v. *Hancock Mutual Life Ins. Co.,* 90 Conn. 303, 97 Atl. 320, L. R. A. 1916E, 584; *Bryant* v. *Fissell,* 84 N. J. Law, 72, 86 Atl. 458.

██ Speaking generally an injury arises in the course of the employment when it arises within the period of the employment, at a place where the employee may reasonably be, and when he is reasonably fulfilling the duties of his employment; and an injury arises out of an employment when it occurs in the course of it and as the proximate result of it. *Kneeland* v. *Parker*, 100 Vt. 92, 135 Atl. 8, 48 A. L. R. 1396; *Brown* v. *Bristol Last Block Co.*, 94 Vt. 123, 108 Atl. 922; *McNicol's Case, supra; Larke* v. *Hancock Mutual Life Ins. Co., supra.* But in any event, the essential connecting link of direct causal connection between the injury and the employment must be established.

█ The accident which resulted in Bundy's death did not occur within the period of his employment or while he was fulfilling the duties of such employment because, as we have seen, the relation of master and servant terminated some hours before and he was then ''a free agent to go where he saw fit.'' Can a rational mind then trace his death to a proximate cause set in motion by his employment, and to no other agency? We think not. The essential connecting link of direct causal connection between the accident and the employment, necessary to a recovery, is lacking. It is undoubtedly true that he would not have been drowned if he had not been required to work that day, but the mere fact that he was required to work did not charge the master with liability for all misfortunes that might perchance befall him after working hours.

Suppose that instead of being drowned in this boarding house he had been drowned while attempting to reach Waterbury, or that he had encountered a violent storm on that journey and been struck by lightning, or killed by a falling tree, could it be seriously claimed that the accident arose out of and in the course of his employment simply because he was required to work that day, even though other men were not? Of course not. Wherein is the distinction in principle between the supposed case and the one before us? There is none.

The findings are embellished somewhat with language respecting ''faithful work under trying conditions''; the ''performance of duty in an emergency''; the ''unexpected hazard from the elements,'' and the ''extremely hazardous neighborhood,'' but there is nothing in the record to show that the conditions attending his work were more trying that day than usual, except that it rained, or that he encountered any unex-

pected hazard from the elements while at work, or that that neighborhood was extremely hazardous when he quit work. Indeed, that such was the fact is refuted by the finding that in going to the Hayes boarding house he did the natural and reasonable thing and that conditions were then such that the average reasonable man could not have foreseen that a flood of unprecedented proportions was impending.

Stripped of all superflous language, the findings come down to this: Bundy was required to work November 3; when he quit work for the day it was impossible on account of high water to reach his room at Waterbury or any public house except the one where he went. That house was then an apparently safe place. The highway was passable for four or five miles in either direction, and there was then nothing to indicate to the average reasonable man that a flood was likely to occur. Some hours later the railroad embankment gave way, and the sudden rush of the water ponded back of it swept away the house where Bundy was staying and caused his death.

While this most unfortunate incident cannot fail to incite the sympathy of all who are familiar with its details, the essential facts found by the commissioner do not support his holding that the accident which caused Bundy's death arose out of and in the course of his employment.

The cases cited by the claimants are so unlike this one in the essential facts presented that they cannot be said to conflict with the result here reached. In the *Harraden Case,* 66 Ind. App. 298, 118 N. E. 142, in *Merrill* v. *Penasco Lumber Co.,* 27 N. M. 632, 204 Pac. 72, and in *Larke* v. *Hancock Mut. Life Ins. Co.,* 90 Conn. 303, 97 Atl. 320, L. R. A. 1916E, 584, the accident occurred while the servant was actually engaged in performing the duties of his employment. In the other cases the accident happened on or near the premises where the servant was required to work either while he was momentarily unemployed or was going to or from his work.

Our conclusion respecting the question considered makes examination of other questions raised unnecessary.

*Order vacated, award set aside, and claim dismissed with costs. Let the judgment be certified to the commissioner of industries.*